## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

ERIC DRENNER,                )
                               )
       Plaintiff,        )
                               )
v.                         )
                               )
UNITED STATES OF AMERICA,    )    **Case No. 15-CV-337-TCK-CDL**
                               )
       Defendants,    )

## OPINION AND ORDER

The plaintiff, Eric Drenner ("Mr. Drenner") filed this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §2671, *et seq.*, and 28 U.S.C. §1346(b)(1). Mr. Drenner seeks damages for alleged medical malpractice arising from the care and treatment he received at the Claremore Indian Hospital ("CIH") from December 6, 2012 to December 12, 2012.

The parties agree that Mr. Drenner has complied with the administrative requirements of the FTCA. (Doc. 128), Pretrial Order, III. C. He filed an administrative claim under FTCA on November 1, 2014. *Id.* The Department of Health and Human Services ("DHHS") did not approve or deny the claim within six months from the date the claim was filed. *Id.*[1] Mr. Drenner timely filed his Complaint on June 6, 2015, after fully exhausting his administrative remedies. (Doc. 2).

On September 16, 2020, the parties filed a motion seeking permission to submit all evidence to the Court without live testimony. (Doc. 101). The Court granted the motion. (Docs. 103-104). The parties have submitted the video depositions of David Dreyfuss, M.D., June Femi-Pearce, M.D., Nathan Powell, D.O., Richard Hastings, D.O., Lon Huff, CRC, Will Clark, PhD.,

---

[1] DHHS denied Plaintiff's claim on June 24, 2015. *Id.*

Mr. Drenner, Glenee Grant, Jody Murphy, Chris James, Christy Wilson-Adkins, Donna O'Neil, Russell Green, M.D., and Khashayar Vaziri, M.D.

The Court has also received and admitted into evidence Plaintiff's Exhibits 1-3, 5, 7-9, 14, 17, 18, 20, 22-23, 25, 37-38, 40, 43, 46, 53, 60, 62, 64-65, 69 7-72, 78-80, 82-83, 85-100, and Defendant's Exhibits 1-62.

Pursuant to Fed. R. Civ. P. 52(a)(1), the Court makes the following findings of fact and states the following conclusions of law.

## I. Findings of Fact

### Medical Negligence Evidence

### *December 6, 2012 Emergency Room (ER) and Pre-Operative Evaluation*

1. Mr. Drenner first presented to the emergency room at CIH on December 6, 2012 at 01:33 with a chief complaint of right sided abdominal pain. Before December 6, 2012, Mr. Drenner had a history of abdominal pain for several years; had been diagnosed with Crohn's Disease or some type of an "inflammatory bowel disease" in approximately 2005; and had a history of kidney stones. (Pl. Ex. 92). Mr. Drenner left the ER at approximately 03:10. (DX 1). Mr. Drenner testified that he left the ER because he had to take his children to school. (PX 92[2], p. 19, ll. 4-19). Mr. Drenner returned to the ER where he was examined by Dr. Femi-Pearse who diagnosed Mr. Drenner with acute appendicitis and a history of Crohn's disease. (PX 1.0005). Crohn's disease is an autoimmune disease generally involving the small intestine but can also involve the colon and rectum. (PX 96[3]2 , p. 19, ll. 3-6).

---

[2] PX 92 is the deposition transcript of Eric Drenner.
[3] PX 96 is the deposition transcript of Dr. David Dreyfuss, Plaintiff's general surgery expert.

2. A CT Scan showed significant progressive inflammatory change involving the pericecal and terminal ileal region when compared to a previous CT Scan done January 31, 2011. (PX 2). Dr. Femi-Pearse recommended a laparoscopic appendectomy and abscess drainage. (PX 1.0006; PX 96, p. 22, ll. 20-22). Dr. Femi-Pearse indicated that he might have to do an open appendectomy and a possible ileocolectomy. (PX 1.0006). An ileocolectomy involves removal of part of the ileum (small intestine) and colon. (PX 96, p. 24, ll. 11-15).

### Appendix Removal

3. (PX 72) is a publication from the Society of American Gastrointestinal and Endoscopic Surgeons (SAGES). SAGES is an organization of surgeons who perform gastrointestinal and endoscopic surgery and is a reliable source of information with respect to appendectomies. (PX 96, p. 11, ll. 5-20). The defense expert Dr. Vaziri is a member of SAGES. (DX 59[4], p. 6, ll. 23-24).

4. An open appendectomy involves making one incision below and to the right of the belly button and a laparoscopic appendectomy involves making three small incisions. (PX 96, p. 8, ll. 80-20; PX 72.0001). In a laparoscopic appendectomy, the surgeon inserts a camera through a port so that the surgeon can see the abdomen on a screen in the operating room. Two other ports are made through which the surgeon inserts the instruments needed to do the surgery. (PX 96, p. 12, ll. 1-25, p. 13, ll. 1-5; PX 72.0002). The surgeon finds and grasps the appendix and either puts ties or staples around it and then disconnects the appendix and removes it. The part of the large intestine or colon to which the appendix is attached is called the cecum. (PX 96, p. 13, ll. 13-24; p. 14, ll. 1-20; PX 72.0002).

---

[4] DX 59 is the deposition transcript of Dr. Vaziri.

### *Dr. Femi-Pearse's December 6, 2012 Surgery*

5. Dr. Femi-Pearse encountered phlegmon immediately upon entering Mr. Drenner's abdomen. (PX 3.0002). Phlegmon is an inflammation response to severe sepsis, where the structures in the vicinity of the problem area congregate and clump together to try to seal off the problem area. (PX 80[5], p. 22, ll. 1-7). PX 17 is a series of photographs taken by Dr. Femi-Pearse during his surgery.[6] Dr. Femi-Pearse identified the phlegmon on PX 17.0002.

6. Dr. Femi-Pearse cut into the phlegmon and noted that it "was difficult to tell which was the cecum." (PX 3.0002). He kept dissecting until he saw what he thought was the cecum. He saw a structure emanating from the base of the cecum that he thought resembled the appendix. (PX 3.0002). Dr. Femi-Pearse identified the structure he thought was the appendix on PX 17.0001. (PX 80, p. 44, ll. 6-11, ll. 21-24).

7. Dr. Femi-Pearse isolated that structure, dissected it out and transected it with the endoscopic stapler and sent it to pathology. (PX3.0002). Dr. Femi-Pearse said in his Operative Report: "It was difficult to determine what was the appendix. I am not even sure if I was able to locate the appendix; however, necrotic tissue that resembled the appendix was excised and has been sent to pathology for confirmation." (PX 3.0001).

8. The Pathology Report does not identify any of the specimens as an appendix. The Pathology Report states that on the largest fragment, there is a 4.8 cm linear line of staples and that the cutefragment may represent a portion of bowel wall. (PX 7).

---

[5] PX 80 is the deposition transcript of Dr. Femi-Pearse.
[6] PX 5 is the same as PX 17 but without Dr. Femi-Pearse's handwriting.

9. Dr. Femi-Pearse saw a structure that was adhered to the right lateral abdominal wall and took the structure off the abdominal wall. The Operative Report does not identify the structure nor does it say what Dr. Femi-Pearse did with the structure. (PX 3.0002).

10. Dr. Femi-Pearse drained the abscess, washed out the abdomen and placed two drains, one in the right gutter and one in the pelvis. Mr. Drenner was extubated in the operating room and transferred to the recovery room in stable condition. (PX 3.0002).

11. After the surgery, Dr. Femi-Pearse spoke to Glenee Grant, Mr. Drenner's mother, and told her that "I cut something out—I don't know what, but we cut something out." Dr. Femi-Pearse then showed Ms. Grant the photos he had taken during the surgery. (PX 93[7], p. 7, ll. 19- 25; p. 8, ll. 6-13).

### *Mr. Drenner's Post-Operative Recovery December 7-12 at CIH*

12. On December 8, 2012, Progress Notes signed by Dr. Femi-Pearse show purulent drainage from one of the drains he placed. (PX9.0005). Purulent drainage is a sign of infection and a sign that the patient is getting worse. (PX 96, p. 44, ll. 19-25, p. 45, ll. 1-16). Purulent drainage could be an early sign that there is a leak or infection in that area. It may also mean there is a small breakdown in the cecum. (DX 59, p. 21, ll. 15-25 through  p. 22, ll. 1-19). The December 9 and 10 Progress Notes show continued draining of purulent liquid. (PX 9.0003; PX 9.0004).

13. The December 11 Progress Notes show continued purulent drainage and the presence of feculent, stool like matter. The Progress Note also references a possible fecal fistula, another indication for the presence of stool. There was concern there was a fistula or a larger leak in the cecum because of the change in the drainage. (PX 9.0002; PX 96, p. 46, ll. 11-25; DX 59, p. 23, ll. 6- 16).

---

[7] PX 93 is the deposition transcript of Glenee Grant.

14. The December 12 Progress Notes show continued purulent drainage. Dr. Femi-Pearse recommended a CT Scan. (PX 9.0001). The CT Scan showed inflammation and a small pocket of air along the lateral tissues which could have indicated a leak. (DX 9, p. 4; DX 59, p. 24, ll. 4-7).

15. Dr. Femi-Pearse then called for an internal medicine consult by Dr. Ira Liebman to get an opinion on a patient with anasarca. Anasarca is significant body-wide swelling. (PX 98[8], p. 113, ll. 24-25 - p. 114, l. 1). Dr. Liebman noted that Mr. Drenner had developed "edema diffusely, fever and abdominal pain. There was particularly an increase in abdominal girth." (PX 14.0001). Dr. Liebman's impression was sepsis, possibly from an intraabdominal source. Dr. Liebman also believed that Mr. Drenner was at high risk for the existence of an abdominal leak. (PX 14.0003).

16. Dr. Femi-Pearse decided to transfer Mr. Drenner, noting that Mr. Drenner may have a bowel leak. (PX 15.0001). Dr. Femi-Pearse noted in the Discharge Summary that Mr. Drenner spiked a temperature and was noticed to have purulent drainage from both drains. He also noted that the repeat CT Scan[9] showed "new fluid collections that cannot be explained. The possibility of a bowel leak exists." (DX 9, p. 2; PX16.0001).

### Mr. Drenner's December 12, 2012 Admission to St. Francis Hospital

17. On admission to St. Francis Hospital on December 12, Mr. Drenner reported that earlier that day he had a large gush of fluid from the incision surrounding the JP drain. (PX 18.0001).

18. Dr. Nathan Powell examined Mr. Drenner on December 13. Dr. Powell noted Mr. Drenner came to St. Francis with complaints of severe abdominal pain, nausea, vomiting, and pus draining from the drains he had in place. Mr. Drenner had a fever of 103.5 Fahrenheit and was tachycardic. He had generalized tenderness diffusely as well as guarding and peritonitis, which

---

[8] PX 98 is the deposition testimony of Dr. Richard Hastings, Plaintiff's medical expert.
[9] Two CT Scans were done on December 12, one in the morning and one in the afternoon. (DX 9).

signifies infection or inflammatory process that's not controlled throughout the abdomen. Dr Powell ordered labs that showed Mr. Drenner's kidneys were suffering as a result of his inflammatory or infectious condition. (PX 20.0001; PX 97[10]10, p. 8, ll. 18-25; p. 9, ll. 1-19).

19. Dr. Powell testified that Mr. Drenner needed to have exploratory surgery because Mr. Drenner was still showing signs of sepsis and peritonitis that were not being controlled despite six days of antibiotics and drain placement. Dr. Powell considered continuing with antibiotics and drains but decided to do surgery because Mr. Drenner had continued sepsis evidenced by his high fever, white blood count, and acute kidney injury. Dr. Powell felt like he did not have control of the source of Mr. Drenner's sepsis "as evidenced by the pus that was just pouring out of his abdominal wounds and he has peritonitis on exam, which again, is widely considered a surgical emergency…" (PX 97, p. 12, ll. 19-23). Sepsis is a multi-organ immune response to an infectious condition. (PX 97, p. 9, ll. 20-25, p. 10, ll. 1-10, p. 12, ll. 7-23). Dr. Powell had a strong suspicion that the pus and continuing infection were caused by a perforation or leak from the first surgery. (PX 97, p. 13, ll. 2-9).

20. Dr. Powell operated on Mr. Drenner on December 14. Upon entering the abdomen, Dr. Powell found a large volume of purulent ascites (pus mixed with normal fluid) in all quadrants of the abdomen, signifying that whatever was causing the pus was uncontrolled and spreading diffusely to the entire abdomen. (PX 97 [11], p. 14, l. 24 – p. 25, l. 8). The bowel was grossly distended and extremely inflamed in the right lower quadrant. Dr. Powell located the cecum and immediately encountered an approximately quarter-size perforation at the tip of the cecum consistent with a recent history of perforated appendix. No appendix was visualized. (PX 22.0002).

---

[10] PX 97 is the deposition transcript of Dr. Nathan Powell.
[11] PX 71 is a medical illustration that generally depicts what happened during Dr. Powell's December 14, 2012 surgery (PX 97, p. 15, ll. 10-15).

There was also a small perforation at the base of the terminal ileum as it entered the cecum. There was a large volume contamination of stool within the pelvis and right lower quadrant. (PX 22.0002).

21. The stool came from the hole in the cecum. The purulent ascites was a response to the stool in the abdomen. (PX 97, p. 18, ll. 8-15). Dr. Powell testified he did nothing to cause or enlarge the hole in the cecum because the hole was at the bottom of the cecum and he did not dissect there. Dr. Powell testified that he did not do anything to cause the perforation at the base of the terminal ileum. (PX 97, p. 18, ll. 16-25, p. 19, ll. 1-17).

22. The bowel was inflamed and thickened and diseased in response to the stool and infection that was surrounding it. (PX 97, p. 16, ll. 23-25, p. 17, ll. 1-11, p. 18, ll. 1-15).

23. Dr. Powell reviewed the operative report from CIH and learned that it was a difficult case; that the previous doctor "was able to remove the structure which he thought was the appendix, but it didn't sound like he was certain that the appendix had been removed". Dr. Powell suspected there was a continuing problem from that area but was not expecting a quarter size hole in the cecum until he got in there and saw it. (PX 97, p. 20, ll. 8-25, p. 21, l. 1). The stool had been leaking for a number of days and Dr. Powell thought it would make sense to say it had been leaking for the six days since the first surgery. (PX 97, p. 22, ll. 12-25)

24. Dr. Powell injured the duodenum during the surgery, recognized the injury and immediately repaired it. The injury to the duodenum was a foreseeable risk or complication of the surgery. (PX 97, p. 23, ll. 10-25, p. 24, ll. 1-4).

25. Dr. Powell then performed an ileocecectomy, removing part of the cecum and the ileum because the tissue was not going to be amenable to repair. Dr. Powell had to find healthier tissue to fix the holes in the cecum and the terminal ileum. (PX 97, p. 24, ll. 5-18; PX 71, #6). Dr. Powell

then finished the surgery by making a hole in Mr. Drenner's abdominal wall, bringing the ileum through the abdominal wall, and reopening it to the outside so that Mr. Drenner would have intestinal continuity to eat and evacuate stool from the ileum into a bag. Dr. Powell felt like there was no viable alternative to the ileostomy that would solve Mr. Drenner's problems. (PX 97, p. 27, ll. 4-20, PX 71, #7).

26. On December 16, 2012, Dr. Powell examined Mr. Drenner and found frank bile from his drains and was concerned that there was a perforation at the previous repair site. In addition, Dr. Powell noted continuous purulent drainage from the left lower quadrant abdominal wall abscess that had previously been packed. Dr. Powell decided to take Mr. Drenner to the operating room for re-exploration. (PX 25.0001).

27. During that surgery, Dr. Powell reopened the previous incision, removed part of the right colon, mobilized the duodenum, partially removed the fatty apron called the omentum and used that to over sew the duodenal perforation. He then put a tube through the abdominal wall into the stomach to the duodenum, washed out and debrided the left lower quadrant and revised the ileostomy. (PX 25; PX 96, p. 61, ll. 4-23).

28. On December 19, Mr. Drenner was returned to the surgical intensive care unit because he was suffering from respiratory distress. (PX 85.0008). Dr. Richard Hastings, Plaintiff's internal medicine expert, testified that septic shock caused the respiratory distress. The sepsis was caused by bowel leakage into the peritoneal space. As a result, Mr. Drenner had to be put on a mechanical ventilator for support. Dr. Hastings testified that septic shock and respiratory failure caused Mr. Drenner's acute renal failure. (PX 85.0017; PX 98[12]12, p. 37, l. 14 – p. 40, l. 10). Dr. Powell

---

[12] PX 98 is the deposition testimony of Dr. Richard Hastings.

testified that Mr. Drenner's kidneys were suffering as a result of his inflammatory or infectious condition. (PX 97, p. 9, ll. 10-12).

29. Mr. Drenner was discharged from St. Francis on January 18, 2013 with the following diagnoses on discharge:

1. Intra-abdominal abscess, secondary to perforated appendicitis.
2. Purulent peritonitis.
3. Septic shock.
4. Crohn's disease.
5. Duodenal perforation with postoperative bile leak.
6. Acute respiratory failure/ARDS, requiring mechanical ventilation.
7. Acute renal failure, resolved.
8. Hyperglycemia.
9. Hyperphosphatemia.
10. Severe protein calorie malnutrition, improved.
11. Hypomagnesemia.
12. Hypocalcemia.
13. Acute blood-loss anemia.
14. Anemia of chronic disease.
15. Thrombocytosis, reactive.
16. Left-sided abdominal wall abscess, postoperative laparoscopic port location.
17. PICC-associated deep venous thrombosis, resolved. (PX 38).

30. In his October 19, 2019 report, Dr. Hastings indicated that the conditions listed on the discharge diagnoses were the result of his intrabdominal peritonitis with septic shock and multisystem failure. (PX 85.0006).

***Additional Surgeries***

31. The parties agree the following 7 surgeries were performed on Mr. Drenner after Dr. Powell's December 16, 2012 surgery, and the parties also agree that all of the surgeries were performed within the applicable standard of care. (Doc. 128, V (e-n)):

(1) April 8, 2013 surgery in which Dr. Robert Goodwin (Dr. Powell's partner), in which Dr. Goodwin drained a large amount of purulent material from Mr. Drenner's abdomen). (PX 40).

(2) June 11, 2013 surgery in which Dr. Powell did a takedown of the ileostomy and connected the ileum back to the colon so that Mr. Drenner could have bowel movements again. (PX 43; PX 96, p. 64, ll. 4-11).

(3) June 15, 2013 surgery in which Dr. Goodwin removed the part of the anastomosis that had leaked, redid it, and fixed the duodenum with a piece of omentum. (PX 46; PX 96, p. 65, ll. 2-17).

(4) November 27, 2013 surgery in which Dr. Goodwin drained purulent necrotic fat from Mr. Drenner's abdomen. (PX 53).

 (5) April 18, 2014 surgery in which Dr. Femi-Pearse drained an abscess in the small bowel. (PX 56).

(6) November 10, 2014 surgery in which Dr. Goodwin performed an exploratory laparotomy, closed a fistula in the small bowel, removed part of Mr. Drenner's intestine, and repaired hernia defects. (PX 60).

(7) April 5, 2016 surgery in which Dr. Goodwin repaired an incisional hernia. (PX 62.0004).

32. Mr. Drenner last saw Dr. Goodwin on May 9, 2019 for follow up. Dr. Goodwin indicated that Mr. Drenner was "well-known to our services after undergoing extensive abdominal surgery. He's also had a hernia repaired with an underlay of biological mesh." Dr. Goodwin noted Mr. Drenner was still having intermittent pain at his incision and had a sizable diastases rectus of the epigastrium. Mr. Drenner indicated he did not want to have surgery at the time and Dr. Goodwin agreed given the extensive surgery Mr. Drenner has already undergone. (PX 64.0005).

***Standard of Care Testimony***

33. Plaintiff's expert, David Dreyfuss, M.D. is board certified by the American Board of Surgery and the American College of Surgeons and is a fellow of the American College of Surgeons. He attended medical school at the University of Vermont, graduating in 1981. He served residencies at the University of Vermont from 1981 to 1983, and at Rutgers in New Jersey from 1983 to 1986, and completed a vascular fellowship from 1986 to 1987. He has been board certified by the American Board of Surgery and has been a fellow of the American College of Surgeons since 1987. He closed his practice of general surgery in 2016, and currently does wound care at local, regional nursing homes and provides readings [at] the vascular laboratory at Our Lady Lourdes Hospital in Binghamton, New York. At the time of the events giving rise to this suit, he was still performing surgery, three days a week, one out of every three weekends 48 to 50 weeks a year.

Dr. Dreyfuss testified that Dr. Femi-Pearse breached the standard of care and caused injury to Mr. Drenner that necessitated all of the subsequent surgeries. Dr. Dreyfuss added that had Dr. Femi-Pearse's surgery been done within the standard of care, the subsequent operation and all the further subsequent operations would not have been required. (PX 96, p. 58, ll. 5-18; PX 96, p. 116, ll. 10-22).

34. Dr. Dreyfuss defined the standard of care as "what a prudent surgeon would do under the same or similar circumstances" and in this case prudence required conversion to an open procedure and performing an ileocolectomy. (PX 96, p. 37, l. 18 – p. 38, l. 4). An ileocolectomy involves removal of part of the ileum and the colon until you find healthy tissue that will hold when you staple them together. It is essentially the same surgery Dr. Powell performed on December 14, 2012. (PX 96, p. 24, ll. 6-15; PX 37, ll. 1-13).

35. Dr. Dreyfuss testified that a surgeon should also switch to an open procedure when the inflammatory process is so severe that he cannot safely staple the base of the appendix and know that it is reliably closed. (PX 96, p. 15, p. 16, ll. 1-11). "A healthy cecum is soft and pliable and feels like normal tissue. When the cecum is inflamed and bathed in pus, the base of the appendix becomes initially very thickened but then becomes very thinned out and attenuated. When that happens, the surgeon will have trouble stapling the appendix/cecum because it is like trying to staple something to wet toilet paper." (PX 96, p. 16, ll. 12-25; p. 17, ll. 1-14).

36. Dr. Femi-Pearse should not have tried to staple the cecum because it was severely inflamed and deceased and the procedure was doomed to failure. Dr. Dreyfuss testified that stapling Mr. Drenner's cecum would be akin to stapling wet tissue paper and expecting it to hold. Instead of trying to staple this mushy, wet toilet paper together, Dr. Femi-Pearse should have converted to an open operation. (PX 96, p. 36, ll. 5-25).

37. Relying on the photos taken by Dr. Femi-Pearse during surgery, Dr. Dreyfuss testified the photos confirmed there was too much inflammation to staple anything closed and that Dr. Femi-Pearse should have converted to an open procedure. (PX 96, p. 40, ll. 2-22).

38. Dr. Dreyfuss was also critical of Dr. Femi-Pearse for proceeding with an operation in which Dr. Femi-Pearse could not identify the appendix. (PX 96, p. 30, ll. 14-25). Dr. Dreyfuss testified that it was perilous to proceed with the surgery in this case because the phlegmon was obscuring the anatomy, and that it is hard to tell exactly what a surgeon is looking at when everything is inflamed in one large, congealed mass. (PX 96, p. 34, l. 17 – p. 35, l. 2).

39. Dr. Dreyfuss also testified that Dr. Femi-Pearse was negligent because he was not even sure what surgery he had performed, and "you can't safely perform an operation without knowing what it is you're cutting and retracting and identifying." (PX 96, p. 83, ll. 2-14; PX 96, p. 30, ll.

14-24). Dr. Dreyfuss testified that a surgeon has to see the specific structures because the surgeon has to know what he is dividing or stapling. (PX 96, p. 17, ll. 15-21).

40. Dr. Dreyfuss identified PX 72, a publication from SAGES as a reliable source of information with respect to appendectomies. (PX 96, p. 11, ll. 5-20). The publication identifies reasons for a surgeon to switch to an open appendectomy, including the presence of an inflamed or perforated appendix or the surgeon's inability to see the patient's organs (PX 72.0003).

41. Dr. Femi-Pearse testified that he was trained to convert a laparoscopic procedure to an open procedure when "you can't really make anything out. You know, when you cannot identify structures specifically that's the thought. Yeah." (PX 80, p. 20, ll. 7-10; p. 21, ll. 12-15). Dr. Femi-Pearse's Operative Report confirms that he in fact could not identify the appendix yet he proceeded to divide and staple what he thought was the appendix and the cecum. (PX 3). And the pathology report identified the specimen with the staples in it as part of the bowel wall, not the appendix (PX 7). The Court finds Dr. Femi-Pearse's deposition testimony that he was 99.5% sure he removed the appendix and that he dictated his operative report "to make it sound graver than it actually [was]," to be not credible. (PX 80, p. 15, l. 5-7; p. 17, ll. 7-23; p. 18, ll. 4-17 and p. 25, ll. 12-22).

42. Defendant's medical expert, Khashayar Vaziri, M.D., F.A.C.S., is board certified by the American Board of Surgery and is a fellow of the American College of Surgery. He attended medical school at Rutgers University – Robert Wood Johnson Medical School—graduating in May 2001. He did his general surgery residency at George Washington University Hospital, graduating in 2007. Dr. Vaziri did a one-year fellowship in advanced fascial intensive laparoscopic surgery at Northwestern University in Chicago, finishing in 2008.  He is a professor of surgery and program director for the general surgery residency program at  George Washington University in Washington, D.C.

Dr. Vaziri testified that he believed Mr. Drenner had a "perforated probably disintegrated necrotic appendix" at the time of the initial operation and that there was a complex phlegmon and inflammation that would make it difficult to identify the tissues. (DX 59, p. 57, ll. 3-18). Dr. Vaziri testified that although Dr. Femi-Pearse described what he thought was an appendix and stapled across it, no appendix was found during Dr. Powell's operation, or on the pathology report from the ileocecectomy. (DX 59, p. 58, ll. 1-4).

43. Using photos taken during the surgery, Dr. Femi-Pearse identified what he claimed was the appendix and cecal staple line on PX 17.0001. With respect to the structure that Dr. Femi-Pearse identified in PX 17 as the appendix, Dr. Vaziri testified that he could not say that was the appendix because the picture was too zoomed in for him to able to clearly say what it was. Dr. Vaziri could not identify with specificity any structure or organ in any of the photos taken by Dr. Femi-Pearce. (DX 59, p. 53, ll. 1-5). Dr. Dreyfuss testified that PX 17.0001 showed a grasper grabbing tissue but he could not tell what it was. (PX 96, p. 39, ll. 11-23).

44. Dr. Vaziri agreed that PX 17.0001[13] showed a staple line on tissue but could not tell whether the staple line was on the cecum. (DX 59, p. 55, ll. 1-13, p. 56, ll. 7-24). Dr. Vaziri testified that Dr. Femi-Pearse thought the appendix to be a piece of necrotic tissue and isolated it and stapled it. However, Dr. Vaziri testified that the pictures of the staple line do not show any necrotic tissue. (DX 59, p. 55, ll. 14-22).

45. Dr. Vaziri admitted that the staples that Dr. Femi-Pearse fired into Mr. Drenner are titanium and "would be there if he actually did staple across the cecum in the original operation" and that if Dr. Femi-Pearse did not staple across the base of the appendix, "all we would see would

---

[13] PX 17 are the same photos as PX 5 but contain Dr. Femi-Pearse's handwriting that explains what is on each photo.

be the two holes, as described in the pathology report, and the fistula." (DX 59, p. 76, ll. 1-13). Dr. Vaziri testified that because the staples allegedly fired into the cecum by Dr. Femi-Pearse were not identified on any pathology report, they are still inside Mr. Drenner's abdomen. (DX 59, p. 76, l. 18 – p. 78, l. 18).

46. Dr. Nathan Powell operated on Mr. Drenner on December 14, 2012. Dr. Powell testified that he was certain there was no staple line in the cecum based on his Operative Report and the Pathology Report. Dr. Powell testified that the staples fired by Dr. Femi-Pearse were either still inside Mr. Drenner, or possibly had been scooped out when Dr. Powell was removing stool and inflammatory tissue from Mr. Drenner's abdomen. (PX 97[14], p. 28, l. 19 – p. 31, l. 5).

47. Dr. Vaziri testified that the standard of care for a particular surgery is "based on many different things" including the "tenets of surgery and what is safe to do for the patient at that time. Of course, it's always first: Do no harm." (DX 59, p. 27, ll. 14-20).

48. Dr. Vaziri testified Dr. Femi-Pearse's surgery was within the standard of care because Dr. Femi-Pearse "found a structure that resembled the appendix" and it was "coming from where he thought the appendix was" and it was safe to divide the tissue with a stapler even though in fact it may not have been the appendix. (DX 59, p. 19. L. 16 – p. 20, l. 3).

49. Dr. Vaziri testified that Dr. Femi-Pearse did not have to convert to an open procedure because he "was able to perform the operation safely in a laparoscopic manner" and opening the patient would have only caused more pain and complications. (DX 59, p. 20, ll. 16-22). He said the same thing about the December 14, 2012 operation performed by Dr. Nathan Powell. In his report, Dr. Vaziri stated that Dr. Powell's December 14, 2012 surgery was "aggressive" and

---

[14] PX 97 is the deposition testimony of Dr. Nathan Powell.

suggested that perhaps a less aggressive approach would have been more appropriate. (DX 54, Report of Dr. Vaziri, p. 4).

50. In response, Dr. Powell testified that the resection was necessary because Mr. Drenner had an uncontrolled process where he was septic with a high fever. Mr. Drenner had general peritonitis and sepsis. He had been treated with antibiotics and drains for six days and was getting worse, not better. In addition, Mr. Drenner had a large volume of stool in his abdomen with purulence throughout. Dr. Powell testified there was no other way to control or get rid of Mr. Drenner's diseased tissue that was actively leaking. (PX 97, p. 25, ll. 3-22).

51. Dr. Dreyfuss testified that an ileocolectomy would have been a less aggressive procedure than firing a stapler across a terribly inflamed cecum. (PX 96, p. 89, ll. 10-20). Dr. Dreyfuss also testified that an ileocolectomy did not involve a higher risk of either an iatrogenic injury or infection because Mr. Drenner already had an infection via a big abscess. (PX 96, p. 90, ll. 3-18). Nor did Crohn's disease pose any additional risks to doing an ileocolectomy. (PX 96, p. 90, l. 19 – p. 92, l. 18).

52. Dr. Dreyfuss agreed that Dr. Powell's surgery was appropriate and that just placing drains and washing out the abdomen would have been inappropriate because it would not allow the quarter size hole in the cecum to heal. (PX 96, p. 96, l. 15 – p. 97, l. 14).

53. Dr. Vaziri testified that he would convert to an open procedure if he is unable to perform the operation safely. (DX 59, p. 9, ll. 5-13). Dr. Vaziri admits that a surgeon should convert to an open procedure when he cannot identify the structures and opening the patient would allow him to identify the structures better. (DX 59, p. 51, ll. 5-19). Dr. Vaziri's "overarching guideline is to be able to perform the operation safely. If you're unable to perform the operation safely in a laparoscopic manner, and you can perform the operation safely in an open manner, then you should

convert to the open operation." (DX 59, p. 67, l. 20 – p. 68, l. 2). Dr. Vaziri could not provide a definition of "performing an operation safely" but said his general guideline is that the surgeon "is able to complete the key portion of the operation that you set out to do in a safe manner without causing harm to the patient." (DX 59, p. 68, ll. 3-13).

54. The Court concludes the Plaintiff established by the greater weight of the evidence that CIH and Dr. Femi-Pearse breached the standard of care owed to Mr. Drenner. The Court finds that Dr. Femi-Pearse should have converted from a laparoscopic procedure to an open procedure and his failure to do so is a breach of the standard of care.

55. Dr. Femi-Pearse admitted in his Operative Report that he had trouble identifying both the cecum and the appendix and concluded at the end of the procedure that he was not even sure he was able to locate the appendix. All doctors agree that Mr. Drenner's colon and terminal ileum were severely inflamed and surrounded by phlegmon, making it difficult for Dr. Femi-Pearse to see what he was doing. The photos taken by Dr. Femi-Pearse during surgery confirm that Mr. Drenner's abdomen was severely inflamed, making it virtually impossible to identify any of the structures in the photos. Dr. Vaziri could not identify any of the structures in the photos while Dr. Dreyfuss confirmed the inflammation shown on the photos was so severe that staples could not hold the inflamed tissue together. Dr. Vaziri did not contradict this testimony.

56. Dr. Femi-Pearse described taking a structure off the right abdominal wall but never identified the structure. The Pathology Report shows that the specimens submitted were portions of the bowel wall and not the appendix.

57. Dr. Femi-Pearse did not fire staples into the cecum but rather into an unknown structure.

58. The Court finds the Plaintiff's evidence on this issue to be more credible. Dr. Dreyfuss gave two reasons for converting to an open procedure, to wit; inability to identify the organs or

structures Dr. Femi-Pearse was dividing and stapling into the diseased and inflamed condition of the structures shown in the photos. Those opinions are supported by the totality of the evidence as well as PX 72, the SAGES publication. The court notes that Dr. Vaziri is a member of SAGES and did not dispute the contents of PX 72.

### *Causation*

59. The Court finds that the negligence of Dr. Femi-Pearse directly caused injury to Mr. Drenner that in turn required all the subsequent surgeries. The medical records and the testimony of Dr. Powell reveal that the stool and contamination he found in Mr. Drenner's abdomen on December 14 came from the hole in Mr. Drenner's cecum. The purulent ascites was a response to the stool in the abdomen. Dr. Powell testified that the stool had been leaking for a number of days and that it would make sense that it had been leaking for the six days since Dr. Femi-Pearse's surgery.

60. Dr. Powell testified that the stool in the abdomen incited the inflammatory and infectious reaction, which is the body trying to heal itself. The small bowel and colon area became inflamed and thickened and diseased as a result of the inflammatory reaction caused by the stool. Dr. Powell testified there was a diffuse reaction and inflammatory process going on. The bowel was thickened and inflamed. The mesentery was inflamed and shortened, and the blood supply was suboptimal given the inflammation to the cecum and right colon. (PX 97, p. 26, ll. 4-17).

61. Dr. Powell testified that he was dealing with complications that ensued from the 12-6-12 surgery and that all of the treatment and surgeries performed by him and his partners dealt with the complications that resulted from the 12-6-12 surgery. (PX 97, p. 26, ll. 18-25).

62. The Progress Notes from CIH support the finding that a leak of some size was present shortly after the December 6 surgery. Dr. Vaziri testified that "the presences of purulent drainage

from the right gutter drain identified in the December 8-9 Progress Notes could be an early sign of a leak, and there may be a small, small leakage in that area and that there may be a small breakdown there." (DX 59, p. 21, l. 15 – p. 22, l. 22). Dr. Vaziri testified that "the December 11 Progress Note shows that the JP drain has turned possibly feculent and there is a concern there is a larger leak in the cecum because of the change in the drainage." (DX 59, p. 23, ll. 6-13).

63. The December 12 CT Scan Reports indicate a suspicion for bowel leak. (DX 9, p. 2, 4). Dr. Liebman and Dr. Femi-Pearse also suspected a possible bowel leak. (DX 10, p. 3; DX 11).

64. While the leak or hole in the cecum may not have been quarter size in the beginning, Dr. Dreyfuss testified that the hole in the cecum became larger between the time Mr. Drenner was transferred on December 12 and his December 14 surgery. (PX 96, p. 108, l. 15 – p. 109, p. 11). Dr. Vaziri agreed that the hole in the cecum was present before Mr. Drenner was transferred to St. Francis Hospital but claims Dr. Powell made it larger when he mobilized the cecum. (DX 59, p. 32, ll. 18-25).

65. Dr. Powell disagrees with Dr. Vaziri because when he mobilizes or frees up adhesions to the colon he does so on the lateral side and the hole was at the bottom of the cecum so he would not be doing much dissection there. He also testified he does not manipulate a perforation or a hole to make it larger. (PX 97, p. 18, l. 20 – p. 19, l. 14).

66. The Court finds that Dr. Femi-Pearse's failure to properly identify, divide, staple, close and secure the cecum during his December 6, 2012 surgery caused the stool to leak from the cecum into Mr. Drenner's abdomen, which in turn required Mr. Drenner to undergo surgery on December 14, 2012.

67. With respect to the operations and hospitalizations after Dr. Powell's December 14, 2012 surgery, the Court agrees with Dr. Powell and Dr. Dreyfuss that these surgeries were the

result of Dr. Femi-Pearse's negligence on December 6, 2012. The Defendant contends these operations were the result of the operation performed by Dr. Powell on December 14, 2012. However, the parties agree that Dr. Powell's surgery of December 14, 2012 was performed within the applicable standard of care. (Doc. 128, p. 3). As the Court will discuss in more detail in its conclusions of law, Dr. Femi-Pearse is liable for any subsequent injury or reinjury that is the proximate result of his original wrongdoing.

### *Damages*
### *Economic Damages*
### *Past Medical Bills*

The parties agree that the amount of past medical bills claimed by Mr. Drenner are $182,900.65. (Doc. 128, p. 3). The medical bills are itemized in PX 65. The index in PX 65 indicates the amounts paid and not the amounts incurred. The Defendant has submitted affidavits (DX 46-53) from the following healthcare providers that correlate with the amount Plaintiff is claiming:

| Provider | Amount Paid |
| --- | --- |
| (1) Associated Anesthesiologists | $10,298.26 |
| (2) EMP of Tulsa County | $1380.40 |
| (3) KCI | $0 |
| (4) Lab Medicine of Greater Tulsa | $1,050.00 |
| (5) Radiology Consultants of Tulsa | $2,062.91 |
| (6) St. Francis Home Health | $465.61 |
| (7) St. Francis Hospital | $131,748.77 |
| (8) Warren Clinic Trauma | $16,916.27 |
| **Total** | $163,922.22 |

21

The Plaintiff has submitted the ambulance bill from Pafford Medical Services for the transfer from Claremore to St. Francis on 12/12/12 in the amount of $1071.00 that was apparently paid by Indian Health Services. (PX 65.0025). The Court finds this bill is related to the Plaintiff's claims.

The Plaintiff has also submitted pharmacy bills from Sam's Club for prescriptions for oxycodone from January 24, 2013 through December 4, 2013 and from November 14, 2014 to May 2016 in the amount of $661.03. (PX 65.0031-65.0040). Considering the fact that no evidence was presented that Plaintiff had a history of taking pain medication before December 2012 and considering that the time frames for the medication coincide with Plaintiff's discharge from his first hospitalization at St. Francis and also coincide with his subsequent surgeries, the Court finds this bill is related to Plaintiff's claims.

The Plaintiff has also submitted bills in the amount of $9,985.81 from Love & Hope 2 Counseling for the dates January 2014 through December 2015. (PX 64.0017-65.0024). These bills coincide with the Plaintiff's testimony regarding his psychological counseling and treatment and are supported by PX 83. The Court finds these bills are related to Plaintiff's claims.

The Plaintiff has withdrawn  his claim to be compensated for the billing from Empower Life Enhancement Services and New Opportunities Waiting.

Based on the above and foregoing, the Court awards the Plaintiff the sum of **$175,650.17** for past medical expenses.

### *Future medical expenses*

With respect to future medical expenses, the Court finds the report of Dr.Russell Green  to be more credible than the reports and testimony of Dr. Amal Moorad, and testimony of Lon Huff and Dr. Richard Hastings.

Mr. Huff's report details the medications, future diagnostic studies, future medical evaluations, future surgical interventions, and projected therapeutic modalities that Mr. Drenner may need in the future. (PX 88, Huff Report, pp. 7-9). Mr. Huff's report and findings are based on the reports of Dr. Richard Hastings and Dr. Amal Moorad.

Dr. Green reviewed 870 pages of Mr. Drenner's prior medical records and also performed a urinalysis for kidney function. He noted a solid repair which was stable, no deficiency in center, and skin intact. The 2020 IME indicated stronger hands, Mr. Drenner was still fishing, and experienced pain in his abdomen with lifting. During a 2 hour examination, Mr. Drenner did not have to use the restroom. He opined that Mr. Drenner's functional ability had improved substantially; depression, while evident in the record, was not caused by the 2012 surgery; kidney stones predated surgery in 2012, and low testosterone was not due to the 2012 surgery. He concluded that while additional surgery may be possible, any anterior wall failure would be more likely caused by bowel disease than anything else. He noted Mr. Drenner had been diagnosed with Chron's Disease as early as 2005, and had a history of abdominal pain since 2000.

Accordingly, the Court finds any award of future medical expenses would be speculative and not based on the record.

### *Lost Wages and Impairment to Earning Capacity*

### *Past Lost Wages*

Mr. Drenner testified that he attended Union High School through 1989 and obtained a GED shortly after he quit school. He also has some post high school formal education. (PX 92, p. 8, ll. 2-9). He started a business called Colors Custom Painting in 1997. In 2007, he added drywall work. (PX 92, p. 10 – p. 11, l. 8). His work was physically demanding, requiring him to use a paint

sprayer that weighed 125-225 pounds; carry five-gallon buckets of paint and 40-foot ladders, handle drywall sheets that weighed up to 67 pounds, and handle scaffolding that weighed 50-100 pounds per piece. The work also required frequent climbing, crawling, bending, lifting, and squatting. Before 2012, he had only some "small limitations" in his ability to do that kind of work. (PX 92, p. 11, l. 9 – p. 13, l. 4).

Mr. Drenner described his unsuccessful efforts to get back into the painting business during his surgeries and recovery therefrom. (PX 92, pp. 30-32). Mr. Drenner testified he cannot physically do the work required to be a painter or drywaller. (PX 92, p. 32 - p. 33, l. 3).

Mr. Drenner now works for Navico, a company that is in the locator business. He is an IT expert. He goes on the road and troubleshoots and repairs fish locators and trolling motors for fishermen all over the country. He is considered a contract laborer and is on the road for 13 weeks a year. He also works in the warehouse doing inventory. (PX 92, p. 34, l. 12 – p. 35, l. 18).

When he is on the road, his bowels start moving at 4:30 – 5:30 in the morning. He has 3-4 bowel movements by 8:00 a.m. He then takes Imodium to keep him from using the bathroom. He makes frequent stops to use the restroom. (PX 92, p. 36, ll. 2-19).

Jody Murphy is a contractor and has known Mr. Drenner since 2000-2001. (PX 95[15]16, p. 4, ll. 13-23). Mr. Murphy hired Mr. Drenner to put finish on the interior and exterior of log homes he was building. Mr. Murphy testified Mr. Drenner's work was good. Mr. Drenner worked on multiple projects for Mr. Murphy until 2009 and he was satisfied with his work. (PX 95, p. 5, ll. 4- 19). Mr. Murphy did not notice any physical limitations that Mr. Drenner had that would prevent him from doing his painting work. (PX 95, p. 5, ll. 20-23).

---

[15] PX 95 is the deposition testimony of Mr. Murphy.

Mr. Murphy described the heavy lifting and physically demanding requirements of Mr. Drenner's job, lifting 5-gallon buckets of lacquer that weigh 70-80 pounds and setting up scaffolding. (PX 95, p. 13, ll. 8-17). Mr. Drenner appeared to be physically fit while working for Mr. Murphy. (PX 14, ll. 1-6).

Mr. Murphy contacted Mr. Drenner in 2014 to see if he could do some work for him on a log home. Mr. Drenner told Mr. Murphy he was not physically able to do the work due to having an operation, or operations. (PX 95, p. 6, ll. 6-17). Mr. Murphy contacted Mr. Drenner again in 2106 or 2017 and again asked him if he could do some work for him on his own personal home. Mr. Drenner agreed to work but told Mr. Murphy he did not have a crew and would do it personally. (PX 95, p. 6, l. 18 – p. 7, l. 6).

Mr. Murphy testified Mr. Drenner's work was "acceptable" but did not think it was the quality he used to get from Mr. Drenner. Mr. Drenner's work was "much slower" and prolonged as he would only work 3-4 hours before having to leave. (PX 95, p. 7, ll. 8-14). Mr. Drenner could not physically work eight hours a day. He had difficulty getting up and down ladders and on scaffolding. Mr. Drenner's work "just wasn't quite what it had been." (PX 95, p. 7, ll. 19-24). Mr. Drenner had trouble getting up and down on his hands and knees. (PX 95, p. 8, ll. 4-12).

Mr. Drenner's Social Security Statements of Earnings and tax returns show the following income:

2011--$31,409 (PX 79.0006)
2012--$16,548 (PX 79.0020)
2018--$18,475 (PX 79.0044)
2019--$ 1,341 (PX 79.0070)

Mr. Drenner testified he was approved for Social Security Disability Income while he was still in the hospital and continues to receive those benefits to date. He has reported all earnings he has made since 2012 to the Social Security Administration. (PX 92, p. 33, ll. 4-20).

William Clark, Ph.D. is an economist. PX 90 is a supplemental report prepared by Dr. Clark on November 3, 2020. Dr. Clark reviewed invoices and other documents from Navico for 2020 and estimated Mr. Drenner's total income for 2020 and up to February 1, 2021 to be $21,769. (PX 90.0003).

Dr. Russell Green testified that when he examined Mr. Drenner in 2016, he thought he could return to work "albeit it would be different than the work he had done for many, many years." (DX 61[16], p. 20, l. 24 – p. 21, l. 1).

Lon Huff is a certified rehabilitation counselor who, among other things, evaluates a person's earnings potential and loss of earnings. As a certified rehabilitation counselor, he is required to be aware of the job market, be aware of job requirements and to be aware of an individual's capabilities for work both physically and mentally. Over the course of his career, he has personally worked on about 700-800 cases. (PX 99[17], p. 9, l. 4 – p. 10, l. 5).

Mr. Huff described the methodology he uses to determine a person's earnings potential, including talking to the person, reviewing medical records, talking to doctors, reviewing job descriptions published by the U.S. Department of Labor, and looking at average earnings for self-employed individuals, again using U.S. Department of Labor information. (PX 99, p. 10- 13). With respect to past earnings potential, Mr. Huff testified the average earnings for painters and drywallers from 2014-2019 was $35,545. (PX 99, p. 31, ll. 5-25).

Mr. Huff was aware that Mr. Drenner had not earned more than $31,409 before his surgeries but felt that was a little misleading as it showed only profit level. Mr. Huff testified the best way to show loss of earning potential is to look at the average earnings and see if that person

---

[16] DX 61 is the transcript of Dr. Green's deposition.
[17] PX 99 is the deposition testimony of Lon Huff.

can meet the average. Mr. Huff testified that methodology is generally accepted in the certified rehabilitation counselor industry when dealing with self-employed individuals. (PX 99, p. 29, l.13-p. 30, l. 10).

Mr. Huff computed Mr. Drenner's past lost earnings to be $241,815.00 and noted that figure should be reduced by any income earned by Mr. Drenner before trial. (PX 88.0010).

Dr. Clark further refined the amount of past lost earnings in his report and testimony. Based on Mr. Huff's report, Dr. Clark determined Mr. Drenner's pre-resolution earning potential loss to be $230,561. (PX 90.0001-90.0002). The Defendant did not produce any evidence to dispute Lon Huff's and Dr. Clark's calculations. The Court finds that Mr. Drenner properly mitigated his damages by trying to return to work from the time of his surgeries to the present. The Court therefore awards Mr. Drenner **$230,561.00** in past lost wages.

### *Impairment to Future Earning Capacity*

In Mr. Huff's report dated December 19, 2019 (PX 88), he noted that Dr. Amal Moorad and Dr. Richard Hastings both stated that Mr. Drenner would not be able to return to work as a painter and drywaller. (PX 88.0009; PX 99, p. 18, ll. 5-14; PX 99, p. 60, l. 23 – 25).

The defense expert, Ms. Wilson-Adkins, agrees that Mr. Drenner cannot return to his previous job as a painter and doing construction and drywall work because he cannot do the required heavy lifting. (DX 6019, p. 17, l. 24 – p. 18, l. 1-3).

In his report, Mr. Huff concluded that Mr. Drenner has a present and future earning potential of $41,885, the more current average earnings potential for painters and drywallers. (PX 88.0009-88.0010; PX 99, p. 28, l. 7 – p. 29, l. 4).

Mr. Huff testified the best way to determine how much Mr. Drenner will earn in the future is to figure out how much he earned in 2020. (PX 99, p. 33, l. 13 – p. 34, l. 34). Mr. Huff was

aware that Mr. Drenner testified he might get a job with Navico making $55,000-$65,000 a year. Mr. Huff did not base his professional opinion on the speculation that Mr. Drenner might get a job with a certain salary as no written evidence of a job offer or potential salary from Navico was produced. (PX 99, p. 34, l. 15 – p. 35, l. 5).[18]

Dr. Clark took Mr. Huff's figures and estimated that Mr. Drenner would earn mitigating income of $20,055 in 2020. Dr. Clark then deducted that amount from Mr. Drenner's future annual earning potential of $42,340 and calculated Mr. Drenner's future annual earnings loss to be $22,285. (PX 90.0001-90.0003).

Dr. Clark determined Mr. Drenner's work life expectancy to be 16.5 years. (PX 100[19], p. 18, l. 15 – p. 19, l. 25). Dr. Clark used a discount rate to reduce future loss of earnings potential to present value. (PX 100, p. 20, l. 6 – p. 21, l. 12; PX 90.0004, n. 7). Dr. Clark computed the present value of Mr. Drenner's future loss of earnings (impairment to earning capacity) to be $314,365.

The Defendant presented the reports and testimony of Christy Wilson-Adkins, who like Mr. Huff is a certified rehabilitation counselor. Ms. Wilson-Adkins admitted she did not review any of Mr. Drenner's tax returns, Social Security Statements of Earnings, or his IRS tax transcripts. She cannot tell the court how much money Mr. Drenner has made from gainful employment since December 2012. She did not review any of the details of the job that Mr. Drenner has with Lowrance (Navico) other than looking at Mr. Huff's report. She testified that Mr. Drenner was qualified to do a number of sedentary, light medium jobs, such as cashier, sales clerk, and telemarketer. (DX 60, p. 11, ll. 5-12). However, she did not testify what those jobs paid.

---

[18] PX 60 is the deposition transcript of Ms. Wilson-Adkins.
[19] PX 100 is the transcript of Dr. Clark's deposition.

The Court finds that the parties agree that Mr. Drenner cannot return to his work as a painter and drywaller. The Defendant did not present evidence to dispute Mr. Huff's calculations regarding past loss of earnings and did not present evidence to dispute Dr. Clark's calculations for future loss of earnings. The Court therefore awards Mr. Drenner the sum of **$314,365.00** for future loss of earnings or impairment to earning capacity.

### *Noneconomic damages*

Mr. Drenner was physically capable of performing heavy manual labor on a daily basis in the years preceding his December 6, 2012 surgery. Mr. Drenner testified that before December 6, 2012, he had not had any kind of surgery. (PX 92, p. 13, ll. 5-9). Mr. Drenner had abdominal problems when he ate green food and had small bowel movements. The doctors called it Crohn's, colitis, and ileitis. (PX 92, p. 13, ll. 12-22). Mr. Drenner got medical treatment and took medications for that problem for a short time. (PX 92, p. 14, ll. 9-12). He learned to deal with it and control it mostly through his diet and by making sure he had a toilet or bucket nearby. (PX 92, p. 14).

Mr. Drenner had been using CIH as his primary source of medical care since he was 21. (PX 92, p. 18, ll. 6-14). Mr. Drenner described flu-like symptoms and abdominal pain that required him to go to CIH ER at 1:00 a.m. on December 6, 2012. (PX 92, p. 19, ll. 1-10). Mr. Drenner has very little memory of what happened while he was at CIH. (PX 92, p. 21, ll. 10-16). His main memory of his stay at St. Francis is waking up from what he describes as a coma on January 3. (PX 92, p. 22, ll. 10-25).

Mr. Drenner described generally the surgeries that he has endured and the problems he has had with respect to relearning basic activities of daily living, having to use a wound VAC for an extended period of time and complications from his ileostomy that require him to use the bathroom

6-12 times a day. (PX 92, p. 24). Mr. Drenner constantly worries about the mesh that is holding his stomach together, fearing he may bend over or do something that will cause his stomach to reopen. He lives with these fears on a daily basis. He fears that if the mesh fails, he will be permanently disabled and not able to do anything. (PX 92, p. 26).

Mr. Drenner identified PX 78.0001-78.0008 as photographs that show his abdomen during and after the surgeries he has had. (PX 92, p. 27, ll. 4-17). Mr. Drenner identified PX 78.0009-78.0012 as more recent photos that show his scarring and disfigurement. (PX 92, p. 27- 29).

Mr. Drenner testified that he lived with the condition of his abdomen shown in PX 78.0001 and 78.0002 for nearly two years. The doctors tried to close him up but the incision would not stay closed. (PX 92, p. 37, l. 12 – p. 38, l. 5).

Mr. Drenner felt "low, worthless, suicidal" when he had to move back in with his mother and stepdad. He said he did not want to live anymore. He described an episode in the hospital when a nurse came to sit with him because he was "ready to end it." (PX 92, p. 42, ll. 4-18).

Mr. Drenner testified he is building a new life with Navico, the company for whom he now works part-time and his new girlfriend. He is however still dealing with "a very tremendous loss in my life" and feels like he lost most of his 40's. (PX 92, p. 43, ll. 1-11).

Mr. Drenner no longer plays golf and no longer goes deer hunting. (PX 78, ll. 7-14). His ability to participate in fishing tournaments has been substantially impaired and he has to have a partner do all the heavy physical work. (PX 77, p. 77, l. 11 – p. 78, l. 6).

### *Psychological Counseling*

The Court has reviewed Mr. Drenner's counseling records from Love & Hope Counseling from January 2014 to December 2016. (PX 83). Mr. Drenner related a history to Therapist Regina East of having a near death experience and being in a medical coma as a result of surgical

procedures. Mr. Drenner indicated he had "intense fear, memory loss, physical loss & feelings of helplessness" after being told what happened. Mr. Drenner said he had to relearn all activities of daily living. Mr. Drenner also referenced problems with his marriage and divorce. Mr. Drenner said he often experienced recurrent and distressing recollections of the event by having to wear a medical bag. Mr. Drenner said he often experienced intense psychological and physical distress. (PX 83.0002).

Ms. East indicated that Mr. Drenner would benefit from individual, family and case management services to identify sills to assist him with self-control, anger and coping with his anger. (PX 83.0002). Mr. Drenner attended seventy-two (72) counseling sessions with the last session taking place on December 16, 2015. (PX 83).

The therapy and counseling records show that Mr. Drenner's primary problems were social skills, coping skills, and trauma. His primary goals and objectives were to identify and process positive changes, increase his self-esteem and community integration. (PX 83.0005; PX 83.0006; PX 83.0096).

On January 27, 2015, Ms. East performed a one-year assessment. She noted slight progress, then regression, little to no change, and not all goals having been met due to client having another surgery. The assessment notes that Mr. Drenner requested continued individual services due to being diagnosed with PTSD and anger management issues related to a severe illness and near-death experience. The remaining portion of the assessment mirrors closely the original intake information on PX 83.0002.

The last record from Love & Hope To2 Counseling is dated December 16, 2015 and indicates that Mr. Drenner had made "Slight Progress". Mr. Drenner was to identify and process

five changes he was willing to make and be more positive. (PX 83.0191). Mr. Drenner last saw a

counselor in 2018[20]. (PX 92, p. 48, ll. 19-23).

### *Lay Witness Testimony Concerning Mr. Drenner's Physical and Mental Condition*

Glenee Grant is Mr. Drenner's mother. Growing up, Eric did not have any surgery or other

physical limitations that would prevent him from doing work as a painter or drywall construction.

(PX 93, p. 4, ll. 11-17).

She was at CIH on December 6 and talked to Dr. Femi-Pearse after surgery. Dr. Femi-

Pearse told Ms. Grant that he did not know how Eric would do after surgery because he was so

full of infection. (PX 93, p. 8, l. 23 – p. 9, l. 1).

On the day Eric was transferred to St. Francis, she saw Dr. Femi-Pearse examine Eric

during which time pussy looking stuff came from Eric's incisions. (PX 93, p. 10, l. 18 – p. 11, l.

9).

After Mr. Drenner was discharged from St. Francis, he lived with Ms. Grant for six years

in a little apartment on her property. (PX 93, p. 14, ll. 18-24). Ms. Grant testified that Mr. Drenner's

incision had to be left open and treated with a wound VAC. (PX 93, p. 17, ll. 4-8). She identified

PX 78.0001 as a photograph that depicted Mr. Drenner's open incision. (PX 93, p. 17, ll. 9-25).

Ms. Grant testified that Mr. Drenner walked "stooped over" for a long time after he came

to live with her. She also testified that his temperament was bad, that it was hard to have a

conversation with him and you had to be careful about what you said to him. (PX 93, p. 19, ll. 9-

19). Mr. Drenner has less stamina than he did before all the surgeries. (PX 93, p. 21, ll. 11-14).

Regarding Mr. Drenner's emotional problems, Ms. Grant testified that not being able to do

---

[20] Counsel for Plaintiff was unable to obtain counseling records after December 2015. Plaintiff's counsel was able to get the bills for the counseling post December 2015 from Empower Life Enhancement Services and New Opportunities Waiting. (PX 65).

fishing tournaments, not being able to do what he did before and having to live with his parents for six years bother him the most. (PX 93, p. 21, ll. 15-25). She testified that Mr. Drenner's outlook on life is not that good and it has affected his relationship with her. (PX 93, p. 22, ll. 17-25).

Ms. Grant was aware of Eric's marital problems. (PX 93, p. 6, ll. 2-12). Ms. Grant testified that Mr. Drenner has moved on from that and does not say much about his ex-wife anymore. (PX 93, p. 22, ll. 1-6).

Chris James has known Mr. Drenner since they were 12 years old. (PX 94 [21], p. 4, l. 19-20). After drifting apart for a number of years, Mr. Drenner reached out to Mr. James in the midst of all of his surgeries. (PX 94, p. 6, ll. 2-13, p. 8, ll. 2-3). Mr. James sees Mr. Drenner once a week or once every other week. They sometimes go fishing and use Mr. James' boat. Mr. Drenner only drives the truck and backs it into the water. Mr. Drenner can no longer stand and fish all day but has to lean back on what they call a "butt seat." (PX 94, p. 10, l. 11 – p. 11, l. 11).

Mr. Drenner has to frequently use the bathroom and is embarrassed by that situation. Mr. James testified that Mr. Drenner bends over really slow because he can feel his abdomen and does not want to tear his mesh loose. (PX 94, p. 12, ll. 14-19). Mr. Drenner talks about this problem quite a bit. Mr. James testified that if Mr. Drenner bends over to pick something up and thinks it is going to hurt, he will "back out of it, ask me for help or whatever." (PX 94, p. 16, l. 12 – p. 17, l. 3). Mr. James testified that Mr. Drenner is suffering from a lack of confidence. (PX 94, p. 12, l. 25 – p. 13, l. 13).

Regarding Mr. Drenner's emotional condition, Mr. James testified that Mr. Drenner will call him to "vent" when he is upset. (PX 94, -p. 13, ll. 16-25). Sometimes Mr. Drenner will "break down" when he calls. Mr. Drenner talks about losing his business and not being able to support

---

[21] PX 94 is the deposition transcript of Chris James' testimony.

himself like he thinks he should. Mr. Drenner feels like he "lost the majority of his 40's" as a result of all of the surgeries. (PX 94, p. 14, ll. 1-22).

Mr. Murphy testified that on one occasion Mr. Drenner "disappeared on me." Mr. Murphy found Mr. Drenner by his back door and "he was just sobbing; I mean visibly sobbing." Mr. Drenner went into "a long tirade about his life," he had lost his business, had lost his wife, had lost his house, and he did not know what he was going to do to recover his life. (PX 95, p. 8, l. 13 – p. 9, l. 9). Mr. Drenner did two more projects for Mr. Murphy after that. Mr. Drenner told Mr. Murphy those would be the last painting jobs he could do. Mr. Murphy last saw Mr. Drenner on the day of Mr. Murphy's deposition. Mr. Drenner was teaching Mr. Murphy's son how to stain and lacquer cabinets. (PX 95, pp. 9-11).

### Current medical condition

Dr. Hastings examined Mr. Drenner on October 10, 2019 and prepared three reports; October 19, 2019 (PX 85); December 20, 2019 (PX 86); and March 4, 2020 (PX 87). Dr. Hastings is board certified in internal medicine and utilizes the differential diagnosis methodology. (PX 85). Dr. Hastings described internal medicine by referring to a definition set forth by the American College of Physicians. "Internal medicine or internists are specialists who apply scientific knowledge in clinical expertise to diagnosis, treatment and compassionate care of adults across the entire spectrum from health to complex illnesses. They are especially well trained in diagnosing puzzling medical problems and in the ongoing care of chronic illnesses and caring for patients with more than one disease process." (PX 98, p. 7, l. 20 – p. 8, l. 5). Dr. Hastings has a Ph.D. in anatomy and has taught anatomy and other courses in medical school. (PX 85.0001-0002).

Dr. Hastings testified that diagnosing and treating Crohn's Disease, abdominal abscess and internal complications caused by laparoscopic appendectomies are within the purview of internal medicine. (PX 98, p. 8, l. 15 – p. 9, l. 4).

Dr. Hastings reviewed Mr. Drenner's medical records, took a history from Mr. Drenner and conducted a physical examination. Dr. Hastings testified that Mr. Drenner's biggest problem was abdominal pain and limitations caused by his abdominal pain. (PX 98, p. 17, ll. 6-17). Mr. Drenner's abdominal pain is continuous and gets worse when he gets up from lying down, getting in and out of cars and doing activities that involve pushing, bending, and lifting in certain positions. Mr. Drenner described his pain as a burning type of pain, which Dr. Hastings said most likely was caused by injury to superficial nerves during some of his surgeries. (PX 98, p. 18, ll. 7-25).

Dr. Hastings testified that Mr. Drenner has "an incredibly weak and very friable abdomen" as a result of the many surgeries he has had. Activities that increase intraabdominal pressure or cause movement or pressure on the abdomen will cause pain. (PX 98, p. 28, ll. 10- 20). Dr. Hastings testified that Mr. Drenner's abdominal pain is persistent and permanent, resulting in weakness and instability of the abdominal musculature that has in turn resulted in permanent loss of some of Mr. Drenner's previous activities. (PX 98, p. 41, ll. 2-10).

Regarding Mr. Drenner's mental pain and suffering, he told Dr. Hastings that he was very despondent about things he could not do now that he could do previously. Mr. Drenner said he was frustrated over his inability to do certain physical activities because those activities made his pain worse. Mr. Drenner told Dr. Hastings he was having nightmares, flashbacks, bad dreams where he would relive some of the horrible pre and post-operative activities he experienced. (PX 98, p. 19, ll. 16-25).

Mr. Drenner also expressed anxiety about his financial situation past and future due to his inability to work much as a result of the surgeries. (PX 98, p. 20, ll. 8-20). Mr. Drenner told Dr. Hastings he has 6-10 bowel movements a day and uses medication to try to reduce the bowel frequency to keep from being embarrassed.

Dr. Hastings was aware of Mr. Drenner's previous mental health issues involving his ex-wife but testified that Mr. Drenner had moved on from those problems and was currently in a relationship with which he was happy. Dr. Hastings concluded that Mr. Drenner's past marital problems did not seen to be a driving force with respect to his current mental health issues. (PX 98, p. 52, ll. 1-23).

Dr. Hastings reviewed Mr. Drenner's counseling records from Love and Hope and indicated the records contained a diagnosis of post-traumatic stress disorder, a diagnosis with which Dr. Hastings agreed. (PX 98, p. 1-19).

Dr. Hastings testified that Mr. Drenner has a "consequential psychological overlay", which he described as a psychological mental health condition resulting from an injury or medical condition not associated with mental health issues. (PX 98, p. 46, l. 10 – p. 47, l. 4).

Dr. Hastings testified that Mr. Drenner's injuries are permanent. (PX 98, p. 53, ll. 4-12; See also PX 85.0021-0022).

Dr. Russell Green examined Mr. Drenner for the Defendant on January 13, 2016 and on January 14, 2020. (DX 55, Dr. Green Reports). In his 2016 report, Dr. Green admitted that it was outside the scope of his expertise, training, and practice to comment on the surgical techniques of Dr. Femi-Pearse. (DX 55, p. 11). Dr. Green said in his 2016 report that "It would not be surprising that the severe illness experienced by Mr. Drenner in December of 2012 would result in sadness and some degree of situational depression." (DX 55, p. 12).

Dr. Green really could not say whether Mr. Drenner was still situationally depressed at the time of his most recent examination because he really did not discuss Mr. Drenner's mental health condition with him. (DX 61 [22], p. 44, l. 20 – p. 45, l. 25, p. 46. L. 11 – p. 47, l. 5). Dr. Green admitted that Mr. Drenner seemed to be happy in his current relationship and was not having any marital problems because his divorce had been resolved. (DX 61, p. 47, ll. 6-12).

Dr. Green stated in his 2016 report that he was not qualified to say whether Mr. Drenner requires treatment for his depression but that in the event he did need treatment, it would not be related to the events of 12/06/12. He affirmed that in his deposition. (DX 55, p. 12; PX 61, p. 43. ll. 11-17).

Dr. Green acknowledged information from the Food and Drug Administration that indicates there are many adverse events and complications from hernia repair or mesh, including pain, infection, hernia recurrence, adhesion, and bowel obstruction. (DX 61, p. 41, ll. 7-24). Dr. Green admitted it was possible that Mr. Drenner may have to have future surgery to deal with these complications. (DX 61, p. 42, ll. 6-17). Dr. Green admitted that Mr. Drenner may have a relapse and need more medication, care, or surgery. Dr. Green admitted that an individual who has had multiple surgeries could have anterior wall failure as well. (DX 61, p. 32, l. 16 – p. 33, l. 6).

Dr. Green testified that Mr. Drenner's scarring and disfigurement is permanent. (DX 61, p. 51, ll. 8-10). Dr. Green said he did not know what Mr. Drenner's future medical situation would be. (DX 61, p. 51, ll. 11-25).

Dr. Hastings recognized that Mr. Drenner had a kidney stone at least once in the past. Dr. Hastings testified that individuals who have hemicolectomy surgery are at exceedingly high risk to develop kidney stones. (PX 98, p. 44, l. 17 – p. 45, l. 2). Dr. Hastings explained that Mr. Drenner

---

[22] DX 61 is the deposition transcript of Dr. Russell Green.

has a shortened colon and problems with diarrhea and that decreases the fluid that your colon is able to reabsorb. That in turn reduces nutrients and chemicals that have an indirect impact on the kidneys by means of a reduction in the fluid presented to the kidneys on a chronic basis. That in turn leads to reduced urinary output and an increase in the concentration of the urine with the end result being calcium oxalate crystals. (PX 98, p. 45, ll. 3-25). Dr. Hastings concluded that although Mr. Drenner may have a kidney stone before his surgeries, he is going to have a lot more of them and the problem will be exacerbated. (PX 98, p. 46, ll. 1-9).

With respect to erectile dysfunction, Mr. Drenner told Dr. Hastings that he had experienced erectile dysfunction during the course of his multiple surgeries. (PX 98, p. 21, ll. 13- 20). Dr. Hastings explained that erectile dysfunction is usually caused by stress the body is experiencing, whether that be mental stress, clinical depression, or anxiety. The stress affects the hypothalamic-pituitary axis that modifies the amount of cortisol in the blood. Elevated cortisol in turn causes erectile dysfunction. (PX 98, p. 58, l. 22 – p. 59, l. 11).

On cross-examination, Dr. Hastings said he wanted to back down a little bit on the erectile dysfunction issue. Dr. Hastings testified that the literature supports the connection but he would say it's multifactorial. Mr. Drenner's stress from pain, despondency and lack of function and activities is part of it but he could not say that other factors could be excluded. (PX 98, p. 88, l. 21 p. 89, l. 4).

The Court finds that Mr. Drenner has experienced severe and substantial physical and mental pain and suffering from December 6, 2012 to the present. While Mr. Drenner's condition has improved considerably, he still experiences physical pain on a daily basis. His abdomen is in a very fragile state. In turn, this causes Mr. Drenner considerable mental pain and anguish as he

constantly worries about reinjuring his abdomen and rendering himself completely and totally disabled.

The difference in Mr. Drenner's condition before and after Dr. Femi-Pearse's surgery is considerable. Mr. Drenner was engaged in work that required constant physical exertion and was able to engage in that occupation without any substantive limitations. Now, Mr. Drenner has been forced to seek a new vocation because all parties agree that Mr. Drenner can no longer physically perform his previous occupation.

The Court finds the testimony of Mr. Drenner, Glenee Grant, Chris James and Jody Murphy to be helpful and credible in explaining the physical and mental pain and suffering Mr. Drenner has experienced.

The Court also finds that Mr. Drenner's injuries are permanent. The Court bases this finding on Dr. Hastings' testimony and on the fact that Mr. Drenner still suffers from the effects of his injuries more than eight years after the fact.

Mr. Drenner's past disfigurement and scarring was severe. The Court has reviewed all of the photographs of Mr. Drenner's scarring and disfigurement and finds that Mr. Drenner should be compensated for disfigurement.

Based on all of the evidence, the Court finds that Mr. Drenner should be awarded the sum of **$1,000,000.00** for noneconomic damages.

**II. Conclusions of Law**

***Jurisdiction, Venue and Administrative Exhaustion***

1. The Court has jurisdiction of the parties and subject matter to hear and determine liability and damages pursuant to 28 U.S.C. §§ 1346(b).

2. Venue properly lies in this District pursuant to 28 U.S.C. § 1420(b).

3. Plaintiff exhausted his administrative remedies and timely filed this action under 28 U.S.C. § 2675.

### Agency/Respondeat Superior

4. The Court finds that Dr. Femi-Pearse was an employee of CIH and as such, CIH is liable for the negligence of Dr. Femi-Pearse. (Doc. 128, III).

### Medical Negligence

5. The Federal Tort Claims Act requires application of Oklahoma law to resolve questions of substantive liability. *Harvey v. United States*, 685 F.3d 939, 947 (10th Cir. 2012). Under Oklahoma law, a "prima facie case of medical malpractice like all negligence claims, contains three elements: (a) a duty owed by the defendant to protect the plaintiff from injury; (b) a failure to properly exercise or perform that duty and (c) plaintiff's injuries proximately caused by the defendant's failure to exercise his duty of care." *Robinson v. Oklahoma Nephrology Associates*, Inc., 154 P.3d 1250, 1254 (Okla. 2007).

6. 'In operating upon a patient, a specialist must use his best judgment and apply with ordinary care and diligence the knowledge and skill that is possessed and used by other specialists in good standing engaged in the same or similar field of practice at that time. This is a higher degree of knowledge and skill than that of a general practitioner. A specialist does not guarantee a cure and is not responsible for the lack of success unless that lack results from his failure to exercise ordinary care, or form his lack of knowledge and skill possessed by other specialists in good standing in the same field.' (OUJI 14.2)

7. A plaintiff cannot recover for negligence unless it was the proximate cause of the injuries for which the plaintiff seeks compensation. *Jones v. Mercy Health Center, Inc.,* 155 P.3d 9 (Okla. 2007). To establish causation, a plaintiff must produce evidence that establishes a causal link

between the negligence and his injuries and must persuade the trier of fact by a preponderance of the evidence that his injuries were caused by negligence. However, causation need not be established to a degree of absolute certainty, nor is the plaintiff required to establish causation to a specifically high level of probability. *McKellips v. St. Francis Hospital*, 741 P.2d 467, 471 (Okla. 1987); Robinson, 154 P.2d at 1254. "A defendant whose conduct contributed to cause a plaintiff's injury is liable for the injury even if his conduct was not sufficient by itself to cause the injury." *Johnson v. Hillcrest Health Ctr.*, *Inc.,* 70 P.3d 811, 819, n. 24 (Okla. 2003).

8. The Court concludes that Dr. Femi-Pearce owed Mr. Drenner a duty of care to perform the surgery on December 6, 2012 with ordinary care and diligence, and the knowledge and skill that is possessed and used by other surgeons in good standing. Mr. Drenner proved by a preponderance of the evidence that Dr. Femi-Pearce breached his duty of care. The Court further concludes that Mr. Drenner suffered injuries as a direct result of Dr. Femi-Pearse's negligence, and he is entitled to recover damages for those injuries.

9. As noted earlier, the parties agree that all surgeries performed after Dr. Femi-Pearse's December 6, 2012 surgery were done within the standard of care. Therefore, even if the Court accepts the Defendant's argument that the surgeries and hospitalizations after December 14, 2012 were all caused by or related to the December 14 surgery performed by Dr. Powell, the Plaintiff would still prevail on the issue of causation. Once the Court finds that the December 6 surgery was below the standard of care and necessitated the December 14 surgery, the Defendant is then liable for any additional injuries caused by the normal efforts of other medical providers in providing treatment that Plaintiff reasonably required. (OUJI 9.8A).

10. In *Shadden v. Valley View Hospital*, 915 P.2d 364, 367 (Okla. 1996), the Court held:

> Under our law the general rule is that an original tortfeasor, negligently causing injury to a third person, is liable for the negligence of a physician who treats the injured person where negligent treatment results in aggravation of or increasing the injuries, so long as the injured person exercises good faith in the choice of physicians. *Atherton v. Devine*, 602 P.2d 634, 636 (Okla. 1979); *Smith v. Missouri, K. & T. Ry. Co*., 76 Okla. 303, 185 P. 70, 73-74 (1918). This rule is founded on sound reasons of public policy and is merely a particular application of the rule that a tortfeasor whose negligence causes injury is also liable for any subsequent injury or reinjury that is the proximate result of the original wrongdoing, except where the subsequent injury or reinjury is caused by either the negligence of the injured person, or the independent or intervening act of a third person. *Atherton*, *supra,* 602 P.2d at 636-637.

Application of this rule means that when the original tortfeasor (Defendant by and through its agent Dr. Femi-Pearse) negligently caused injury to Mr. Drenner, he became liable for the negligence of later physicians who treated Mr. Drenner where the negligent treatment results in aggravation or increasing the injuries, so long as Mr. Drenner acted in good faith in choosing Dr. Powell. The parties admit that Dr. Powell was not negligent but even if he was, the Defendant would still be liable for any increased injury or aggravation of any injury to Mr. Drenner caused by Dr. Powell.

**Damages**

11. Under Oklahoma law, any person who suffers detriment from the unlawful act or omission of another, may recover from the person at fault in compensation therefor in money, which is called damages. 23 Okla. Stat. § 3. In a negligence case like this, "the measure of damages…is the amount which will compensate for all detriment caused thereby, whether it could have been anticipated or not." 23 Okla. Stat. § 61."

12. 12 Okla. Stat. § 3009.1 limits a plaintiff's recovery of medical bills to the amounts actually paid provided the Defendant complies with the statute and produces the requisite affidavits from the healthcare providers in question. The Court has applied that standard to the medical bills presented by the parties. The Court's findings with respect to damages are consistent with Oklahoma law regarding damages in bodily injury cases.

### III. Conclusion

Based on the foregoing findings and conclusions, the plaintiff Eric Drenner is entitled to a Judgment in his favor and against the Defendant, United States of America, in the total amount of **$1,720,576.17.**

**IT IS SO ORDERED this 17th day of November, 2021.**

TERENCE C. KERN
United States District Judge

43